WRIGHT, Justice.
Henrietta Walker, now Kauley, appeals the district court’s order and judgment awarding possession of her home to the Housing Authority of the Sac and Fox Nation, and ejecting her from her home. She was purchasing the home under a mutual help homeownership (“MHO”) agreement with the Housing Authority of the Sac and Fox Nation, operating under the authority of the Sac and Fox Nation and the United States Department of Housing and Urban Development (“HUD”).
The facts in this case have been stipulated by the parties, and are essentially uncontested. Ms. Kauley had a long history of late housing payments, and on five prior occasions, had received Notices of Termination from the Housing Authority. In each of those cases, she paid her ar-rearage and late fees, and the MHO Agreement was reinstated. She attended a mandatory counseling session on March 2, 1993, and a compliance agreement was entered into by the parties the following day. The topics of said counseling are stipulated, and, significantly, did not include budgeting and money management counseling. Shortly thereafter, Ms. Kau-ley was hospitalized for mental illness, and during that hospitalization, she was visited in the hospital by the director of the Housing Authority, who negotiated another new compliance agreement with her. In response to a termination notice dated May 18, 1993, Ms. Kauley made a $225.00 partial payment, which was accepted by the Housing Authority. Even though the Housing Authority had already filed this action in the District Court, on August 11, 1993, it sent Ms. Kauley a “Notice of Late Fee” requesting payment of $305.00 by September 1. On August 12, 1993, Ms. Kauley tendered $305.00 to the Housing Authority, but payment was refused by the Authority. Ms. Kauley was not served with process in this case until nearly one month later.
During the course of litigation in the trial court, Ms. Kauley made several discovery requests of the Housing Authority to which the Authority objected. It then sought a protective order from the court, which order was granted in part and de *536 nied in part. Finally, on August 10, 1994, the trial court entered its order finding for the Housing Authority and awarding possession of the home to the Housing Authority. From this order, Appellant appeals.
I. DISCOVERY
After conducting a hearing on the merits of the Housing Authority’s motion for protective order, the trial court granted a protective order with respect to the following discovery requests:
Interrogatory No. 5: If the answer to Interrogatory No. 4 admits a payment attempt, please state the reason for the rejection of the payment. Please provide any policy statements of the Plaintiff which support this rejection. Please provide any legal basis or theory which supports the policy statement of Plaintiff.
Interrogatory No. 6: Please state the names and addresses of any homebuyers of the Housing Authority to whom an exception to this policy prohibitiing [sic] payment has been made. State the reason for said exception. Include any court-ordered or allowed payments made after the prohibition policy would normally refuse payment.
Interrogatory No. 9: Please state the percentage number of home buyers who have recieved [sic] a letter indicating late payment or default from the Plaintiff during the years 1991, 1992, and 1993.
Interrogatory No. 11: Please state the names of all employees who are considered qualified to interpret and explain federal regulations governing the MHO program.
Request for Documents No. 7: Please provide a full and complete copy of any written policy, statement or memorandum which specifically prohibits payment on a past due account for any reason. Provide a copy of any underlying authority or regulations which permits this policy.
Request for Documents No. 9: Please provide any internal memorandum or documents from the years 1991, 1992, and 1993 which related to nonpayment or late payment by participants in the MHO program for the Housing Authority. Include any policy statements or internal regulations dealing with late payment.
Request for Documents No. 10: Please provide copies of all records relating to the training of any employees or persons who counselled Defendant. Include any schools or seminars said person attended and any relevant testing or performance evaluation which would show clinical proof of competency.
Request for Documents No. 11: Please provide blank copies of all form documents normally sent to a MHO participant who falls behind in payment.
Request for Documents No. 17: Please provide redacted copies of any grievances or complaints the Housing Authority has recieved [sic] in the past three years concerning rude or arrogant behavior on the part of any counselor or employee of the Housing Authority.
The purpose of the discovery process is to permit the parties to uncover all evidence which may have a bearing on the outcome of the litigation. Oftentimes, a party may have to make broad requests in order to discover specific items which may be important pieces of evidence at trial. The Sac and Fox Code specifically states that “[ijt is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the *537 discovery of admissible evidence.” 6 Sac and Fox Code § 401(b)(1).
In viewing this case in retrospect, it would appear that all of the discovery re-my quests were relevant and proper to the : defense of Ms. Kauley’s case. 13 Sac and Fox Code § 401. We also take judicial notice of the HUD regulations requiring Indian housing authorities to provide a defendant the opportunity to examine any rm: relevant documents, records, or regula- : tions directly related to the termination or eviction. 24 CFR § 905.335(b)(6). Fur-Ay ther, at the hearing on the merits of the Housing Authority’s motion for protective order, the Housing Authority failed to show that complying with these discovery requests would be so embarrassing, op-pressive, or unduly burdensome as to warrant protection. 6 Sac and Fox Code § 401(c). District judges are given broad powers in deciding such matters, as a part of their power to administer justice within the jurisdiction of their court. 9 Sac and Fox Code § 106. However, that latitude it must balance the rights of the parties to conduct their lawful and appropriate discovery. We find that litigants must be given wide latitude to discover all poten-I i tially relevant evidence, and that discovery ¡Í protective orders under 6 Sac and Fox s Code § 401(c) should be granted only in cases where there is substantial need of JJí: protection. That burden not having been i1 met in the instant case by the Housing v. Authority, and it appearing to us that Ms. i\ Kauley’s discovery requests were reason-í¡ ably and properly designed to lead to relevant information, we must conclude that if the trial judge abused his discretion in v granting the protective order, and that Ms. i Kauley should be permitted her discovery.
II. BILLING STATEMENTS AS BINDING REFORMATIONS
Ms. Kauley places a great deal of weight on her argument that a routine billing statement asking for payment of her arrears by a certain date constituted a reformation or amendment of her MHO agreement in her favor. We cannot concur with this position.
At English common law, an informal contract or modification had to have mutual assent—a meeting of the minds. Household Fire Ins. Co. v. Grant, 4 Ex.D. 216, 220 (1879). We have previously held that extra-tribal common law is not binding upon this Court. Parsons v. Clark, Case Number SC-94-02. Yet, the orderly administration of justice in this jurisdiction requires us to adopt some of the system of law which has been granted to the Sac and Fox Nation.
In the Indian Reorganization (Wheeler-Howard) Act of 1934 (IRA), Congress reversed a long-standing policy of weakening and dissolving the governments of the Indian tribes in this country, and authorized the reestablishment of some form of tribal self-government. Through the IRA and the subsequent Thomas-Rogers Oklahoma Indian Welfare Act of 1936, the Sac and Fox Nation reestablished its tribal government and adopted a new constitution in 1937. Significantly, the IRA gave the Secretary of the Interior the power to approve all new tribal constitutions. 25 U.S.C.A. § 476. We can take judicial notice of the fact that the Secretary chose to direct new tribal governments into a common law systems and legal forms common to the United States of America and to the individual states themselves. In fact, most of the early tribal constitutions were written by Department of the Interior attorneys, and variances from the established form would not have been approved.
We have further taken judicial notice in the fact that much of the Sac and Fox Code was modeled from statutes of the State of Oklahoma. Parsons, supra. *538 Oklahoma also requires that a contract or contract modification have the mutual assent of the parties. State ex rel. Oklahoma Capitol Imp. Authority v. Walter Nashert and Sons, Inc., 518 P.2d 1267 (Okla.1974). We hereby adopt this line of thinking from the English and Oklahoma common law.
Having established the common law rule with respect to contracts, we cannot find that the August 11, 1993 billing statement constituted a modification to the MHO agreement then in force. Certainly, the Housing Authority had no such intent. However, the reasoning of the trial court in making its similar determination is of concern to us. The trial court found that “such letter did not operate to create or initiate a new agreement between Plaintiff and Defendant. Primarily, because it was sent by error, was computer generated and was not authorized a [sic] a supervisor either in writing or orally.” It is not acceptable to us that a new defense be established in this jurisdiction that excuses conduct because “the computer did it.” Computers are tools which are programmed by humans, and humans retain the responsibility for supervising the work product of computers.
III. HOUSING AUTHORITY PROCEDURE
The preceding two arguments bring into view the procedure which the Housing Authority uses in the course of monitoring and managing the MHO agreements within its jurisdiction. Had Ms. Kauley been permitted her discovery, she may well have established a pattern in the Housing Authority’s actions with respect to accepting late payments and reinstating MHO agreements. Certainly, in the instant case, she had on many occasions received notices of termination and then was later permitted to catch up the arrears and continue with the MHO program. Ms. Kauley suggests that this pattern of behavior creates an equitable estoppel to preclude the Housing Authority from later foreclosing on her home.
The HUD Mutual Help Home Ownership Program represents a mixture of legal doctrines, especially established for low income housing projects developed and operated by an Indian housing authority (“IHA”). Sac and Fox Hemsing Authority v. McKosato (“McKosato”), Case Number SC-90-01. The typical homebuyer under an MHO agreement is one who cannot obtain conventional financing from normal commercial channels. They also are typically individuals of lower education and with a lack of sophistication with respect to Anglocentric legal procedures. Phillips v. Standing Rock Housing Authority, 16 ILR 6127 (St.Rc.Sx.Tr.Ct.1989). And, we must also be cognizant of traditional Sac and Fox ways and beliefs, wherein individual real estate “ownership” is a completely foreign and incomprehensible concept.
We cannot overlook the responsibility of an Indian housing authority to take all reasonable steps to keep a homebuyer in his or her home. HUD goes so far as to have regulations authorizing special plans or payments schedules, and “procedures for counseling and assistance to tenants and homebuyers so as to minimize the need for resort to the remedy of eviction.” 24 CFR § 905.305. Certainly an IHA has a fiduciary responsibility to collect rent and mortgage payments on a timely basis, in order to remain eligible for future federal assistance. There will be times when there is no other remedy but to evict or eject a tenant or homebuyer. But as a matter of public policy, the tribe and the public is better served by close cooperation and more proactive counseling by the IHA with habitually delinquent tenants and home buyers, to cure defaults and delta- *539 quencies wherever possible, rather than to evict and eject the people for whom the I HA program was designed to serve.
It is with that purpose in mind that HUD enacted certain regulations requiring an IHA to counsel homebuyers. One of the specific topics of counseling that is required by HUD regulations is budgeting and money management. 24 CFR Ip § 905.453(b)(4). This court has previously fly addressed this topic with the Sac and Fox I Housing Authority in the McKosato case, wherein we specifically held that counselling on budgeting and money management M is mandatory and not discretionary.
We find no testimony or stipulation in the trial court record to show that said budgeting and money management coun-selling ever took place with Ms. Kauley, and that failure is fatal to the Housing Authority’s case. While we look cautiously favorably upon Ms. Kauley’s argument that an equitable estoppel applies in this case on the basis of her history of repeated default and cure with no warning or counseling that her ability to cure was in the future terminated, it is not necessary for us to reach and rule upon this issue, due to the Housing Authority’s failure to counsel and meet procedural requirements as mandated under McKosato.
The ruling of the trial court is affirmed in part and reversed in part, and remanded to the trial court with instructions to dismiss.
BLACK, C.J., and STEPSON, WAKOLE, and WATKINS, JJ., concurring.